Case No. 23-50696

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

JAVIER AMBLER, SR., individually, on behalf of all wrongful death beneficiaries of JAVIER AMBLER, II, on behalf of the ESTATE OF JAVIER AMBLER, II, and as next friends of J.R.A., a minor child; MARITZA AMBLER, individually, on behalf of all wrongful death beneficiaries of JAVIER AMBLER, II, on behalf of the ESTATE OF JAVIER AMBLER, II, and as next friends of J.R.A., a minor child; MICHELLE BEITIA, as next friend of J.A.A., a minor child; Javier Ambler, II, Estate of Javier Ambler, II,

*Plaintiffs – Appellees.*

v.

MICHAEL NISSEN,

*Defendant – Appellant,*

---

On Appeal from the United States District Court
For the Western District of Texas, Case No. 1:20-cv-1068
Hon. Robert Pitman, District Judge

---

### APPELLANT MICHAEL NISSEN'S
### PETITION FOR REHEARING EN BANC

---

**Stephen B. Barron**
State Bar No. 24109619
sbarron@w-g.com
**WRIGHT & GREENHILL, P.C.**
4700 Mueller Boulevard, Suite 200
Austin, Texas 78723
512-476-4600
512-476-5382 – Fax

**Blair J. Leake**
State Bar No. 24081630
bleake@w-g.com
**WRIGHT & GREENHILL, P.C.**
4700 Mueller Boulevard, Suite 200
Austin, Texas 78723
512-476-4600
512-476-5382 – Fax

## **CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Fifth Circuit Rule 35.2.1, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

| **Interested Party** | **Interest** |
|---|---|
| Javier Ambler, Sr.<br>Maritza Ambler,<br>J.R.A., a minor child,<br>Michele Beitia,<br>J.A.A., a minor child. | Plaintiffs-Appellees |
| Jeff Edwards<br>David James<br>Paul Samuel<br>Lisa Snead<br>**EDWARDS LAW**<br>603 W 17th St.<br>Austin, TX 78701 | Counsel for Plaintiffs-Appellees Javier Ambler SR., Maritza Ambler, and JRA |
| Antonio M. Romanucci<br>Bhavani Raveendran<br>**ROMANUCCI & BLANDIN, LLC**<br>321 N. Clark Street, Suite 900<br>Chicago, Illinois 60654 | Counsel for Plaintiffs-Appellees Michele Beitia and J.A.A. |

| | |
|---|---|
| Officer Michael Nissen | Defendant-Appellant |
| Stephen B. Barron<br>Blair J. Leake<br>**WRIGHT & GREENHILL, P.C.**<br>4700 Mueller Boulevard, Suite 200<br>Austin, Texas 78723 | Counsel for Defendant-Appellant<br>Officer Michael Nissen |
| The City Austin, Texas | Defendant (Not a party to this appeal). |
| Meghan L. Riley<br>Monte L. Barton<br>Gray Laird<br>**City of Austin Law Department**<br>P.O. Box 1546, Austin, TX  78767-1546 | Counsel for Defendant<br>The City of Austin |

_____/s/ Stephen B. Barron_____
Stephen B. Barron
Attorney of Record for Appellant
Michael Nissen
**October 8, 2024.**

## Fed. R. App. P. 35(b) Statement

Pursuant to Federal Rule of Appellate Procedure 35(b)(1), for the reasons articulated *infra*, the panel's majority decision conflicts with prior decisions of this Court and the United States Supreme Court. Consideration by the full court is therefore necessary to secure and maintain uniformity of this Court's decisions. Furthermore, this proceeding involves two issues of *exceptional* importance to all law enforcement officers in the Circuit.

# **TABLE OF CONTENTS**

Certificate of Interested Persons.................................................................ii

FED. R. APP. P. 35(b)(1) Statement..........................................................iv

Table of Contents .......................................................................................v

Index of Authorities ..................................................................................vi

Issues Meriting Rehearing En Banc ......................................................... 1

Statement of Facts .................................................................................... 3

Procedural History.................................................................................... 5

Arguments & Authorities .......................................................................... 6

    A. Issue 1: The majority ignored the mandate of *Plumhoff* and "misconceived" this Circuit's interlocutory framework in *Argueta* to erroneously refuse to disturb the district court's factual findings under the second and third *Graham* factors. Under the correct standard, Nissen is clearly entitled to qualified immunity ........................... 6

        a. Second *Graham* factor ........................................................ 6

        b. Third *Graham* factor.......................................................... 8

        c. Failure to intervene .......................................................... 11

    B. Issue 2: The majority erred in subjecting Nissen to the heightened deadly force standard articulated in *Garner*. This holding will make it impossible for officers to receive qualified immunity in any case involving accidental death ......................................................................... 12

        a. The majority's deadly force analysis erred under *Scott*.....12

        b. Sitting en banc, this Court ought to thoughtfully reevaluate its precedent that deadly force is a "fact question." ................ 13

Conclusion & Prayer .............................................................................. 17

Certificate of Compliance ...................................................................... 18

Certificate of Service.............................................................................. 18

# INDEX OF AUTHORITIES

**CASES**                                                                 **PAGE**

*Aguirre v. City of San Antonio,*
  995 F.3d 395 (5th Cir. 2021).........................................2, 12, 15, 16

*Argueta v. Jaradi,*
  86 F.4th 1084 (5th Cir. 2023) ...............................................1, 6, 7

*Brothers. v. Zoss*,
  837 F.3d 513 (5th Cir. 2016).........................................................16

*Darden v. City of Fort Worth, Tex.*,
  880 F.3d 722 (5th Cir. 2018)....................................................2, 14

*Graham v. Connor*,
  490 U.S. 386 (1989)...........................................................*passim*

*Griggs v. Brewer*,
  841 F.3d 308 (5th Cir. 2016)....................................................9, 10

*Gutierrez v. City of San Antonio*,
  139 F.3d 441 (5th Cir. 1998)........................................................14

*Hutcheson v. Dallas Cnty., Tex.*,
  994 F.3d 477 (5th Cir. 2021).....................................................1, 11

*Joseph on behalf of Est. of Joseph v. Bartlett*,
  981 F.3d 319 (5th Cir. 2020).......................................................7, 9

*Mullenix v. Luna*,
  577 U.S. 7 (2015)........................................................................16

*Plumhoff v. Rickard*,
  572 U.S. 765 (2014)...................................................................1, 6

*Salazar v. Molina*,
  37 F.4th 278 (5th Cir. 2022)
  *cert. denied*, 143 S. Ct. 1781 (2023) ...................................1, 4, 7, 8

**CASES (cont'd)**                                                                          **PAGE**

*Scott v. Harris*,
    550 U.S. 372 (2007) ......................................................................... 2, 7, 12, 14

*Singleton v. Casanova*,
    No. 22-50327, 2024 WL 2891900
    (5th Cir. June 10, 2024) ........................................................................ 16, 17

*Spiller v. Harris Cnty., Tex.*,
    113 F.4th 573 (5th Cir. 2024) ......................................................................... 9

*Terrell v. Allgrunn*,
    114 F.4th 428 (5th Cir. 2024) ......................................................................... 6

*Timpa v. Dillard*,
    20 F.4th 1020 (5th Cir. 2021) ................................................................... 15, 16

*White v. Balderama*,
    153 F.3d 237 (5th Cir. 1998) .......................................................................... 6

*White v. Pauly*,
    580 U.S. 73 (2017) ....................................................................................... 11

**STATUTES**                                                                        **PAGE**

FED. R. APP. P.
    35(b)(1) .................................................................................................... iv

## ISSUES MERITING REHEARING EN BANC

*"[W]hat legal error! Nissen should receive qualified immunity from both claims at both prongs of the standard [Qualified Immunity] analysis."*[1]
—Smith, J., dissenting.

**Issue 1:** Did the panel majority ignore the mandate of *Plumhoff* and "misconceive"[2] this Circuit's interlocutory framework in *Argueta*[3] to erroneously refuse to disturb the district court's factual findings under the second and third *Graham* factors? Under this flawed analysis, did the majority wrongfully dismiss Nissen's qualified immunity appeal despite "multiple clear videos…"?[4]

**Yes**. This error is underscored by the majority's split with this Circuit's interlocutory jurisprudence—a schism which the majority's authorship pointedly telegraphed in dissent to rehearing *Argueta* en banc.[5]

Here, under the correct interlocutory analysis, Nissen is clearly entitled to qualified immunity under *Salazar* and *Hutcheson*.[6]

---

[1] *Ambler v. Nissen*, No. 23-50696, Slip. Op. at 21, 23, (5th Cir. Sept. 10, 2024) (Smith, J., dissenting) (exclamation point original).

[2] *Id.* at 21 – 22 ("Some of the majority's errors stem from its *misconception* of the appropriate standard of review.") (emphasis added).

[3] *Plumhoff v. Rickard*, 572 U.S. 765, 771 – 72 (2014); *Argueta v. Jaradi*, 86 F.4th 1084 (5th Cir. 2023).

[4] *Ambler*, Slip. Op. at 21 (Smith, J., dissenting) (describing the videos as clear).

[5] *Compare Ambler*, Slip. Op. at 19, 9 – 10 (Douglas, J., Maj. Op.) (lecturing the dissent on the interlocutory scope of review) *with Argueta v. Jaradi*, 94 F.4th 475, 476 – 81 (5th Cir. 2024) (Douglas, J., dissenting from denial of rehearing en banc) (arguing that the *Argueta* panel wrongly applied the precepts of interlocutory review).

[6] *Hutcheson v. Dallas Cnty., Tex.*, 994 F.3d 477, 479 (5th Cir. 2021); *Salazar v. Molina*, 37 F.4th 278 (5th Cir. 2022) *cert. denied,* 143 S. Ct. 1781 (2023).

**Issue 2:** Did the panel majority err under *Scott v. Harris* in holding Nissen must face a fact question on deadly force, and accordingly must contend with the heightened standard under *Garner*?

**Yes**. *Scott* made it clear that it is error to trigger such a rigid precondition. Instead, all that matters is if the officer's actions were reasonable under *Graham*. If the majority's error is not corrected, the dissent correctly recognized that the majority's holding will doom the officers of Texas, Mississippi and Louisiana to *never* receive qualified immunity in *any* case involving an accidental death.[7]

En banc, this Court's precedent that deadly force is a "fact question" that controls reasonableness[8] under *Graham* ought not to be immune from thoughtful reappraisal. As it stands, this precedent conflicts with *Scott*, because this fact question functions as a "magical on/off switch" that civil rights plaintiffs in accidental death cases can flip to trigger punitive preconditions. [9]

---

[7] *Ambler*, Slip. Op. at 21 (Smith, J., dissenting).

[8] However, if force was the *causation of death* is easily a fact question for a jury. *Accord Darden v. City of Fort Worth Tex.*, 880 F.3d 722, 728 (5th Cir. 2018) ("A tortfeasor takes his victim as he finds him.").

[9] *See Scott v. Harris*, 550 U.S. 372, 375 (2007) *contra Aguirre v. City of San Antonio*, 995 F.3d 395, 412 – 13 (5th Cir. 2021) (acknowledging *Scott* yet "[n]evertheless" reaffirming a fact question on deadly force could summon this rigid precondition").

## STATEMENT OF FACTS

1.     On March 28, 2019, Javier Ambler II refused to pull over for a routine traffic stop for Williamson County deputies. [10]

2.     Instead, Ambler fled. He ran red lights and weaved in and around traffic as he led police on a life-threatening chase at speeds exceeding 100mph.[11] Austin police officer Michael Nissen was kept informed about the dangerous chase via radio.[12] He did not chase, but when Ambler approached his location, Nissen tried to deploy stop sticks. Before Nissen could deploy the sticks, Ambler's wrecked car sped past him— coming close to hitting him. Nissen then observed Ambler spinout sideways, almost hit cars stopped at a traffic light, and then cross the sidewalk before hitting some poles.[13] The spinout was captured by Austin's police helicopter.[14] The crash was loud and severe—but Ambler continued fleeing.[15]

3.     Nissen then heard over the radio that Ambler's vehicle had crashed a third and final time and was now stopped. Nissen went to help and arrived a little less than one minute after the deputies.[16] On arrival, Nissen saw the deputies standing over

---

[10] **ROA.3608**.
[11] **ROA.3645** *see also* **ROA.3642** (Exhibit 11, 20:30 – 22:15).
[12] **ROA.3821**
[13] **ROA.3643** (Exhibit 12, 02:50 – 02:57 (Ambler's driving past Nissen); **ROA 3821 – 3822**
[14] **ROA.3624** (Exhibit 6, 2:25 – 2:37).
[15] **ROA.3643** (Exhibit 12, 03:40 – 03:45).
[16] **ROA.3642** (Exhibit 11, 22:40 (Deputy makes contact); 23:11 (Nissen arrives).

Ambler *vigorously* struggling with him.[17] In the scuffle, Ambler stated he could not breathe, and that he had congestive heart failure. The clear video evidence depicted that Ambler "rather obviously provid[ed] resistance to the multiple officers trying to cuff him."[18]

4.    Ambler had just committed a dangerous felony and was unrestrained at night in the open.[19] Because of the preceding high-speed chase, Nissen made the split-second decision to help the deputies handcuff him. Nissen's body-worn camera video captured that he used a "modicum" of force.[20] As the dissent notes:

> Nissen spent about a minute controlling Ambler's hand—without touching any other part of his body—and then no more than 20 seconds applying pressure to Ambler's upper back and head.[21]

During that time, one deputy used a taser on Ambler in "drive stun" mode. "Tragically, in part because of an imperceptible medical condition, Ambler died during the arrest as a result of the restraint."[22]

---

[17] **ROA.3822; ROA.3643** (Exhibit 12, 04:18 – 04:32); **ROA.3642** (Exhibit 11, 23:20 – 23:22).

[18] *Ambler*, Slip. Op. at 27 (Smith, J., dissenting).

[19] *Accord Salazar v. Molina*, 37 F.4th 278, 284 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 1781 (2023).

[20] **ROA.3643** (Exhibit 12, 04:40 – 06:10) (Nissen's force).

[21] *Ambler*, Slip. Op. at 21 (Smith, J., dissenting).

[22] *Id.*

## PROCEDURAL HISTORY

5.      Appellees sued Nissen alleging he used excessive force under the Fourth Amendment and that he failed to intervene to stop force used by Williamson County deputies.[23]

6.      Nissen moved for summary judgment in the district court, asserting the defense of qualified immunity. The district court denied summary judgment as to the excessive force and failure to intervene claim, citing fact questions under the second and third *Graham* factors.[24]

7.      Nissen filed this of interlocutory appeal, challenging the district court's order denying qualified immunity.[25]

8.      On September 10, 2024, a panel of this Court *diametrically* split 2-1 on Officer Nissen's entitlement to qualified immunity on every prong of the defense and on both of Appellees' claims.

9.      The majority held that it would dismiss Officer Nissen's interlocutory appeal because it would not disturb the district court's identified factual disputes—holding they precluded a finding that Nissen's force was reasonable under the second and third *Graham* factors.

---

[23] **ROA.349 – 350**.
[24] **ROA.7967** (Report and Recommendation); **ROA.8119 – 8120** (Order adopting Report).
[25] **ROA.8122 – 8123**.

## ARGUMENTS & AUTHORITIES

**A. Issue 1: The majority ignored the mandate of *Plumhoff* and "misconceived" this Circuit's interlocutory framework in *Argueta* to erroneously refuse to disturb the district court's factual findings under the second and third *Graham* factors. Under the correct standard, Nissen is clearly entitled to qualified immunity.**

### a. Second *Graham* factor.

*"It boggles the mind to think that a reasonable officer would not perceive Ambler as a meaningful threat."*[26]

10.    Under *Plumhoff*, when an officer contends that:

> [T]heir conduct did not violate the Fourth Amendment…they raise legal issues; these issues are quite different from any purely factual issues that the trial court might confront if the case were tried; deciding legal issues of this sort is a core responsibility of appellate courts, and requiring appellate courts to decide such issues is not an undue burden.[27]

11.    With clear video evidence in this case, Nissen's immunity is ripe to be ruled on as a matter of law. "The ultimate determination of Fourth Amendment objective reasonableness is a question of law."[28] More specifically, as restated in *Terrell*, the second *Graham* factor is an issue of pure law because "an assessment of whether a suspect's *physical actions* amount to threatening behavior bearing on an excessive-force claim is a question of law."[29]

---

[26] *Ambler*, Slip. Op. at 25 (Smith, J., dissenting).
[27] *Plumhoff v. Rickard*, 572 U.S. 765, 773 (2014).
[28] *White v. Balderama*, 153 F.3d 237, 241 (5th Cir. 1998).
[29] *Terrell v. Allgrunn*, 114 F.4th 428, 438, n. 6 (5th Cir. 2024) (emphasis added) (citing *Argueta*, 86 F.4th at 1090.

12.    Here, the dissent correctly noted that the majority contravened *Argueta* in its analysis holding otherwise:

> The majority suggests that there is a genuine dispute of material fact "whether a reasonable officer would believe that [Ambler] . . . was subdued [or] an immediate threat to safety when Nissen began helping handcuff him." But this factor—which may or may not be the most important in this context—"is a question of law left to the court." And with the benefit of two videos of Ambler's arrest, this factor readily resolves in favor of Nissen.[30]

13.    Under the correct standard, the dissent rightfully realized that the majority's focus on whether there was a fact question as to if Ambler was "subdued" should be analyzed "under the third *Graham* factor" not the second.[31] This is in accord with *Joseph*, which analyzed potential subdual under the third factor.[32] For the second factor, the focus is on whether a reasonable officer could assess if *Ambler's actions* were a threat as a matter of law.[33]

14.    Under this Court's precedent in *Salazar*, what "preceded the surrender mattered."[34] As a matter of law, Nissen could reasonably view Ambler as an immediate threat because of his actions in the preceding high-speed chase. Ambler's

---

[30] *Ambler*, Slip. Op. at 26 (Smith, J., dissenting) (citing *Argueta*, 86 F.4th at 1092).
[31] *Id.* at 27.
[32] *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 335 (5th Cir. 2020).
[33] *Accord Scott*, 550 U.S. at 381, n. 8 ("At the summary judgment stage, however, once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record,* the reasonableness of Scott's actions—or, in Justice STEVENS' parlance, '[w]hether ***[respondent's] actions*** have risen to a level warranting deadly force,'—is a pure question of law.") (cleaned up) (emphasis added).
[34] *Salazar*, 37 F.4th at 282.

flight showed he had little to no regard for the lives of others, and when Nissen arrived on scene, Ambler was—just as in *Salazar*—"still unrestrained and feet from an unsearched car, despite the efforts of multiple other police officers who had deployed a taser."[35]

15.    The only "act" that Ambler affirmatively took to convey he was not a threat were his statements about his medical problems. But under *Salazar*, "[i]n the context of this sort of chase, when a reasonable officer hears Ambler's pleas, he reasonably assumes 'ploy' not 'medical emergency.'"[36] In holding otherwise, the majority erred—getting the law precisely backwards. Thus, under the correct interlocutory standard, the district court's factual dispute was immaterial. Properly focusing on Ambler's actions, the second *Graham* factor weighed for Nissen.

### b.  Third *Graham* factor.

*"Ambler was far from subdued"*[37]

16.    The majority applied the incorrect interlocutory framework to preserve the district court's factual findings and hold that Nissen must face a jury on the third *Graham* factor. Generally, the majority found: (1) that a jury could find Ambler could not escape and was not resisting because he was "subdued" and; (2) that a jury could believe Appellees' allegation that Ambler was not resisting arrest, but instead

---

[35] *Ambler*, Slip. Op. at 25 (Smith, J., dissenting); *accord Salazar*, 37 F.4th at 278.
[36] *Id*. *accord Salazar*, 37 F.4th at 278.
[37] *Id.* at 28.

was having a medical emergency.[38] The first conclusion is clearly contradicted by the video. The second applies the wrong analysis under *Griggs* because there is clear video evidence.[39]

17.    As to whether Ambler was "subdued," the dissent correctly wrote that the videos showed "Ambler was far from subdued." Since he was not subdued, Ambler's inability to flee was immaterial.[40] To the extent the majority declined to view that fact on the video, it declined its duty under the *Argueta* framework to truly review the "genuineness" of that dispute.  Unlike Judge Willett's concerns in *Spiller*, this is not an ambiguous viewing of the video.[41] Instead, the video shows:

> Ambler ignored command after command, continuously and rather obviously providing physical resistance to multiple officers trying to cuff him. ***It does not get more clear-cut than that***.[42]

18.    The majority also applied the wrong standard when it held Nissen must face a jury because it could believe Appellees' contention—with the highly prejudicial benefit of 20/20 hindsight—that Ambler was not *intentionally* resisting arrest but instead having a medical emergency.

19.    In *Griggs*, this Court heard a similar argument and rejected it as the wrong standard. The plaintiff argued that "due to ambiguities in the video" and "his

---

[38] *Ambler*, Slip. Op. at 9 – 10.
[39] *Griggs v. Brewer*, 841 F.3d 308, 313 (5th Cir. 2016).
[40] *Ambler*, Slip. Op. at 28 (Smith, J., dissenting) (noting that *Joseph*'s concern with "lack[ing] any means of evading custody" is predicated on actually being subdued).
[41] *Spiller v. Harris Cnty., Tex.*, 113 F.4th 573, 582 (5th Cir. 2024) (Willett, J., concurring).
[42] *Ambler*, Slip. Op. at 27 (Smith, J., dissenting) (emphasis added).

testimony" a "reasonable jury" might find that that he was not *intentionally* resisting arrest but instead drunkenly pulled away from the officer.[43]

20.    The *Griggs* Court held that it was irrelevant if a jury *might* believe Griggs' subjective proffer, as that was not the proper inquiry. Instead, the "court must measure the force used under the facts as a reasonable officer *would perceive them*, not necessarily against the historical facts."[44] After analysis of video evidence, the *Griggs* Court dismissed Griggs' desire to present his drunkenness fact question to the jury—holding "Griggs's actions would, to a reasonable police officer, amount to resistance to arrest."[45]

21.    Here, the district court and the majority failed to analyze how a reasonable officer would perceive Ambler's resistance to being put into handcuffs. If it had, *Salazar* would have been dispositive. Because of the prior high-speed chase, *Salazar* holds:

> …Nissen could reasonably doubt the genuineness of Ambler's pleas, [and] he could reasonably interpret Ambler's attempt to move away from officers as resistance rather than as a struggle for his life.'[46]

22.    The majority's counter holding—relying on *Darden*—overreads that case to hold that Nissen must face this issue as a fact question.[47] In *Hutcheson*, this Court

---

[43] *Griggs*, 841 F.3d at 313.
[44] *Id*. (emphasis original).
[45] *Id*. at 314.
[46] *Ambler*, Slip. Op. at 27 (Smith, J., dissenting).
[47] *Ambler*, Slip. Op. at 10.

held that officers who used prone restraint on an individual—who later died "from a combination of narcotics in his system and the stress of his struggle"—did not violate the Fourth Amendment with their force.[48]

23.    The *Hutcheson* plaintiffs' asserted that was "unclear whether Hutcheson was resisting" and they thus relied on *Darden* and *Joseph* to send that assertion to a jury.[49] This Court disagreed and held that both of those cases did not apply because *video evidence* physically showed the Hutcheson "resisted handcuffing while on the floor."[50]

24.    There is clear video evidence of Ambler resisting handcuffing here. So, *Hutcheson* distinguishes *Darden*. Under the correct interlocutory review, the third *Graham* factor weighs in Nissen's favor.

### c.  Failure to intervene.

25.    For the same reasons articulated *supra*, Nissen was also entitled to qualified immunity for the failure to intervene claim. He was also entitled to immunity because he arrived late and had to assume the deputies were acting reasonably.[51]

---

[48] *Hutcheson v. Dallas Cnty., Tex.*, 994 F.3d 477, 479 (5th Cir. 2021).
[49] *Id*. at 480.
[50] *Id*.
[51] *White v. Pauly*, 580 U.S. 73, 80 (2017).

**B. Issue 2: The majority erred in subjecting Nissen to the heightened deadly force standard articulated in *Garner*. This holding will make it impossible for officers to receive qualified immunity in any case involving accidental death.**

### a. The majority's deadly force analysis erred under *Scott*.

*"Scott flatly rejected [the majority's] errant reading of Garner."*[52]

26.    The majority erroneously analyzed deadly force separately from the other *Graham* factors. It held that Nissen had to face a jury on a fact question as to if his force was *deadly*—specifically because the district court identified that Ambler stated he had a heart condition and "I can't breathe" in Nissen's presence.[53] The majority overread *Garner* to restrict Nissen to this "rigid precondition" of the heightened deadly force standard. That standard requires an officer to articulate "a threat of serious harm justifying the use of deadly force"[54] lest his force be *per se* unreasonable.[55]

27.    The dissent correctly rejoined that the Supreme Court "flatly rejected this errant reading of *Garner*."[56] Specifically:

> *Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force, all that matters is whether [Nissen]'s actions were reasonable.'[57]

---

[52] *Ambler*, Slip. Op. at 30 (Smith, J., dissenting).
[53] *Id*. at 21.
[54] *Ambler*, Slip. Op. at 10.
[55] *See Aguirre*, 995 F.3d 395, 412 – 13.
[56] *Ambler*, Slip. Op. at 30 (Smith, J., dissenting).
[57] *Id.* (citing *Scott*, 550 U.S. at 382).

En banc review is accordingly needed to correct the majority's deadly force analysis—which clearly conflicts with *Scott*. If the majority's decision is not corrected, the dissent correctly predicts that *Ambler* will make it impossible for officers to receive qualified immunity in *any* accidental death case.[58]

### b. Sitting en banc, this Court ought to thoughtfully reevaluate its precedent that deadly force is a "fact question."

*"The majority essentially eliminates qualified immunity*
*in cases of accidental death"*[59]

28.    Ambler's death was clearly accidental. If a suspect dies by accident in the course of an arrest, officers were necessarily not attempting to use deadly force. If deadly force were warranted, police are trained to respond accordingly, and the death "would likely not be accidental."[60] But since deadliness is currently a fact question in this Circuit "a defendant will never get" immunity in an accidental death case.[61]

29.    That cannot be right. But the dissent rightly notes that the majority's rationale "categorically eliminates QI from this set of cases."[62]  Sitting en banc, this Court ought to thoughtfully reevaluate its precedent that deadly force is a "fact question"

---

[58] *Id.*
[59] *Id* at 22.
[60] *Id*.
[61] *Id*.
[62] *Id*.

for the purpose of determining *reasonability* of force under *Graham*.[63] But *Scott* reveals deadliness should be a question of law.

30.    In 2007, *Scott* reversed the Eleventh Circuit on an interlocutory appeal after that Circuit:

> Taking respondent's view of the facts as given…concluded that [the officer's] actions could constitute deadly force under [*Garner*]….[a]ccordingly, a reasonable jury could find that [officer] violated respondent's Fourth Amendment rights.[64]

In reversing, the Supreme Court also rejected the respondent's argument that since the factual "preconditions for using deadly force were not met in this case, [the officer's] actions were *per se* unreasonable" under *Garner*.[65]

31.    Before *Scott*, this Court had previously held in 1998 in *Gutierrez* that it would be a question of fact as to if force would be categorized as deadly. *Gutierrez* further held that this fact question would summon up the restrictive deadly force standard under *Garner*.[66]

32.    After *Scott*, this Court never analyzed how its precepts affected the permissibility of the *Gutierrez* fact question until *Aguirre* in 2021. *Aguirre* was a difficult case, and the panel wrestled with the opinion—which included two

---

[63] However, if force was the *causation of death* is easily a fact question for a jury even in accidental death cases. (*Accord Darden v. City of Fort Worth Tex.*, 880 F.3d 722, 728 (5th Cir. 2018)) ("A tortfeasor takes his victim as he finds him.").

[64] *Scott*, 550 U.S. at 376 (cleaned up).

[65] *Id.* at 382 (Respondent's rejected argument).

[66] *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998).

concurrences. Judge Jolly only concurred in the result. Judge Higginson declined to join part II B.[67]

33.     In part II A of the opinion, *Aguirre* briefly analyzed if the Supreme Court's holding in *Scott* affected *Gutierrez*. The opinion acknowledged that *Scott* held that there is no:

> [M]agical on/off switch that triggers rigid preconditions whenever an officer's actions constitute deadly force and that such claims are broadly analyzed under the same general rubric of reasonableness as other excessive force claims.[68]

34.     However, after that acknowledgment, *Aguirre* paid *Scott* no more mind. In the next breath the opinion held that "[n]evertheless" it would continue to apply the *Gutierrez* fact question regarding deadly force.[69] After *Aguirre*, later panels—such a *Timpa*—took *Gutierrez*'s fact question for granted post-*Scott* and did not tangle it with *Scott*'s holding.[70]

35.     But some of this Court's jurisprudence has resisted reflexively applying the *Gutierrez* fact question. In *Brothers*, this Court rejected a plaintiff's characterization that there was a fact question that force was "tantamount to deadly force" just

---

[67] *Aguirre v. City of San* Antonio, 995 F.3d 395 (5th Cir. 2021).
[68] *Id.* at 412.
[69] *Id*. at 412 – 13.
[70] *Timpa v. Dillard*, 20 F.4th 1020, 1032 (5th Cir. 2021).

because it resulted in death.[71] In so holding, the *Brothers* opinion took guidance from the late Justice Scalia's concurrence in *Mullenix*.[72]

36.     Recently in *Singleton*, Judge Engelhardt also wrote in accord with *Scott* that "[e]ven when deadly force is used, the standard is still one of reasonableness."[73] This pronouncement was accompanied by a footnote that delineated the tension in the case law. It noted "conduct not typically expected to cause serious bodily injury or death can nevertheless have deadly consequences."[74]

37.     As it stands, the *Gutierrez* fact question currently acts as a "magical on/off switch" that civil rights plaintiffs in accidental death cases can flip to trigger punitive preconditions at their pleasure.[75] This issue has long lingered in this Court's jurisprudence—but the need to address it was masked in cases like *Aguirre* and *Timpa*, as they involved lengthy restraint.[76]

38.     But here in *Ambler*, the force was miniscule, the time was minimal, but the need after the dangerous chase was great. If this issue is not resolved here, this case will truly make it "impossible for officers to receive qualified immunity in cases of

---

[71] *Brothers. v. Zoss*, 837 F.3d 513, 520 (5th Cir. 2016).

[72] *Id.* at n. 15 (*Cf. Mullenix v. Luna*, 577 U.S. 7, 19 – 20 (2015) (Scalia, J. concurring)).

[73] *Singleton v. Casanova*, No. 22-50327, 2024 WL 2891900, at *6 (5th Cir. June 10, 2024).

[74] *Id*. at n. 9.

[75] *Id*.

[76] Indeed, due to the length of the force those cases could have resolved on a normal application of the *Graham* factors. *See e.g., Aguirre,* 995 F.3d at 413 (five minutes); *Timpa,* 20 F.4th at 1028 (fourteen minutes).

accidental death, no matter how reasonable their use of force was in context…".[77] This Court should not doom the officers of Texas, Mississippi and Louisiana to that fate.

## CONCLUSION & PRAYER

39.    As articulate *supra*,  the majority opinion contradicts prior precedents of this court and the precedents of the United States Supreme Court.

For these reasons, this Court should grant the extraordinary relief of rehearing en banc.

Respectfully submitted,

**WRIGHT & GREENHILL, P.C.**
4700 Mueller Blvd., Suite 200
Austin, Texas  78723
(512) 476-4600
(512) 476-5382 – Fax

By:＿＿＿/s/ Stephen B. Barron＿＿＿＿＿
    Stephen B. Barron
    State Bar No. 24109619
    sbarron@w-g.com
    Blair J. Leake
    State Bar No. 24081630
    bleake@w-g.com

**ATTORNEYS FOR APPELLANT**
**MICHAEL NISSEN**

---

[77] *Ambler*, Slip. Op. at 22 (Smith, J., dissenting.).

## CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. R. 35.2 and 35.5, the undersigned certifies that this Petition complies with the type-volume limitations of FED. R. APP. P. 35(b)(2), and pursuant to 5th Cir. R. 32.1 and 32.3, the undersigned certifies that this brief complies with the type-face and the type style requirements of FED. R. APP. P. 32(a) pursuant to FED. R. APP. P. 32(c)(2).

1. Exclusive of the exempted portions in 5th Cir. R. 32, and non-exclusive of the statement required by FED. R. APP. P.25(b)(1) and 5th Cir. R. 35.5, this Petition contains:
   a. **3,897** words, which is less than the limit of 3,900 words allowed by FED. R. APP. P. 35(b)(2).

2. This Petition was prepared:
   a. In proportionally spaced typeface using **Microsoft Word 365** for Macintosh Computers in **Times New Roman font**. **14 Point** was utilized for the Body of the Petition. **12.5 Point** was utilized for the footnotes.

       /s/ Stephen B. Barron
Stephen B. Barron
Attorney of Record for Appellant
Michael Nissen
**October 8, 2024.**

## CERTIFICATE OF SERVICE

I certify that on this 8th day of October 2024, a true and correct copy of the foregoing Reply Brief of Appellant was forwarded to the clerk for the Fifth Circuit Court of Appeals and to counsel of record via e-service through the CM/ECF e-filing program in accordance with Federal Rule of Appellate Procedure 25(c)(2).

       /s/ Stephen B. Barron
Stephen B. Barron

**COPY OF PANEL OPINION**

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 10, 2024

Lyle W. Cayce
Clerk

No. 23-50696

JAVIER AMBLER, SR., *individually, on behalf of* ALL WRONGFUL DEATH BENEFICIARIES OF JAVIER AMBLER, II, *on behalf of* THE ESTATE OF JAVIER AMBLER, II, *and as next friends of J.R.A., a minor child*; MARITZA AMBLER, *individually, on behalf of* ALL WRONGFUL DEATH BENEFICIARIES OF JAVIER AMBLER, II, *on behalf of* THE ESTATE OF JAVIER AMBLER, II, *and as next friends of J.R.A., a minor child*; MICHELLE BEITIA, *as next friend* J.A.A., *a minor child*; JAVIER AMBLER, II, ESTATE OF JAVIER AMBLER, II,

*Plaintiffs—Appellees*,

*versus*

MICHAEL NISSEN,

*Defendant—Appellant.*

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:20-CV-1068

---

Before SMITH, WIENER, and DOUGLAS, *Circuit Judges*.

DANA M. DOUGLAS, *Circuit Judge*:

Several officers attempted to restrain an individual following a high-speed chase. As they did so, the suspect exclaimed that he was suffering congestive heart failure and could not breathe. One Austin City Police Officer

continued to restrain the arrestee despite those pleas. A few minutes later, the suspect died. His family later brought a lawsuit in federal court, alleging theories of excessive force and bystander liability against the restraining officers. As pertinent here, the Police Officer moved for summary judgment on qualified immunity grounds. But the district court denied the motion, reasoning that genuine fact disputes precluded a judgment as a matter of law. Because those fact disputes were material, we DISMISS for lack of jurisdiction and REMAND for further proceedings.

I

Javier Ambler II was traveling on a Texas roadway in the early morning hours without dimming the high beams on his vehicle. A Texas sheriff's deputy noticed and signaled for Ambler to stop, but Ambler refused. A high-speed pursuit then ensued as more officers joined the chase. Authorities trailed Ambler for more than twenty minutes along interstate highways and residential streets, at times exceeding speeds of one-hundred miles per hour. The chase ended when Ambler crashed into roadside trees within the city limits of Austin, Texas. After the collision, a deputy approached Ambler and the wrecked vehicle with his gun drawn. As Ambler opened his car door, another deputy ordered him to "get on the ground," and discharged a taser. Ambler fell to the ground from the shock, and two deputies tried handcuffing him.

That was the moment when Austin City Policeman Michael Nissen entered the scene. The events that followed are in dispute. We nevertheless restate the facts "in the light depicted by the videotape" *Scott v. Harris*, 550 U.S. 372, 381 (2007), or in this case, Nissen's body-worn camera, which shows the following: On arrival, Nissen advanced toward Ambler's vehicle with his gun drawn. He called out to the other officers that the car "look[ed] clear" and then approached the deputies, who were standing over Ambler's

Case: 23-50696    Document: 80    Page: 29    Date Filed: 09/08/2024

No. 23-50696

body. One of the deputies held a taser to Ambler's neck and said: "Give me your hand or I'm going to Tase you again." Ambler faintly exclaimed that he had congestive heart failure. An officer then yelled: "Other hand. Give me your hand." As one officer instructed Ambler to lie "flat on [his] stomach," Ambler twice said, "I can't breathe."

The officers repeatedly told Ambler to stop resisting, to which Ambler responded: "I am not resisting." Using his hands, Nissen then applied force to Ambler's arms and the back of his head, pushing it into the pavement. One of the deputies exclaimed: "I think I just broke his finger." Another said "I am going to put my knee on this one to control him. Let me know when you're ready." The officers then handcuffed Ambler, who appeared limp. Less than thirty seconds later, the officers raised Ambler to a seated position and checked for a pulse. They felt nothing. Ambler was taken to a hospital where he was pronounced dead; the medical examiner's report stated that his manner of death was homicide.

Ambler's family filed suit in federal district court against Williamson County, the City of Austin Texas, and several defendants, including Nissen.[1] According to the family, Nissen violated Ambler's constitutional rights by using excessive force and failing to intervene in the altercation that allegedly cost Ambler his life. The district court denied Nissen's motion for summary

---

[1] Several defendants had been dismissed prior to Nissen's motion for summary judgment. Plaintiffs also alleged that the City of Austin failed to provide Ambler reasonable accommodations, in violation of Title II of the ADA, and is liable for Nissen's Fourth Amendment violation under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Neither theory is relevant to this appeal. The district court dismissed the deliberate indifference claim, and the arguments against the City are not implicated in this appeal.

judgment, finding that Nissen could not avail himself of qualified immunity.[2] Nissen now appeals that ruling.

## II

We typically lack jurisdiction over non-final district court orders, although a few exceptions exist. Numbered among them, we may review interlocutory denials of summary judgment on qualified immunity. But that review is confined: We have jurisdiction to consider such appeals only if they "turn[] on an issue of law." *Curran v. Aleshire*, 800 F.3d 656, 660 (5th Cir. 2015) (quoting *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir.2004) (en banc)).[3] In other words, judging the genuineness of the district court's factual findings (i.e., whether they exist) is off limits; determining whether those factual findings have "legal significance" is fair game. *Joseph ex. rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 331 (5th Cir. 2020) (citation omitted). We review the latter issue de novo. *See, e.g.*, *Flores v. City of Palacios*, 381 F.3d 391, 394 (5th Cir. 2004).

With those basics in mind, we must unfortunately complicate matters further. Although the district court's factual findings are given near-complete deference, we cannot disregard clear video footage when available: If events in dispute are recorded, as they are here, we do not accept any facts that are "*blatantly* contradicted by the record" *Scott*, 550 U.S. at 380 (emphasis added); *see also Bros. v. Zoss*, 837 F.3d 513, 517 (5th Cir. 2016) (Smith, J.) ("The Supreme Court has created a narrow exception to this

---

[2] The factual findings and legal conclusions were outlined in a report and recommendation issued by the Magistrate Judge. Because the district court adopted the ruling, we refer to the opinion throughout as the "district court's ruling."

[3] Because both qualified immunity issues involve questions of law, we consider the merits of the disputes to the extent that they are legally significant. *See Argueta v. Jaradi*, 86 F.4th 1084, 1088 (5th Cir. 2023).

jurisdictional limitation where the record blatantly contradicts one party′s version of events.″). The summary judgment standard otherwise remains the same: We view all other facts "in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009). A movant is entitled to a judgment as a matter of law if they show "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

## III

Plaintiffs' complaint challenges Nissen's allegedly unconstitutional conduct under 42 U.S.C. § 1983, a statute that holds state actors liable for depriving claimants of their constitutional rights. In this case, Plaintiffs say Nissen violated the Fourth Amendment, which protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. Plaintiffs contend that, by holding Ambler's body to the ground during a medical emergency, Nissen used unreasonable force which was a contributing cause of Ambler's death." Plaintiffs also contend that Nissen should have protected Ambler from the other officers' unnecessary force. Nissen's failure to do so, Plaintiffs assert, means Nissen is equally liable for his failure to intervene.

In response to Plaintiffs' allegations, Nissen invokes the doctrine of qualified immunity ("QI"), a defense that shields government officials "from liability for civil damages[.]" *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether an official is entitled to such a defense depends on the answers to two distinct legal questions. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The first asks whether the official violated another's constitutional rights; the other asks if the alleged violation was "clearly established" when the misconduct occurred. *Id.* The latter inquiry involves

a review of legal authority to see if caselaw has deemed similar police actions to be illegal, thus putting state officials on "notice." *Id.*

In this case, the district court denied QI based on an inconclusive record and the presence of several factual disputes. The issue presented for this appeal is whether those disputes were "legally significant" and support the district court's holding. *See Joseph*, 981 F.3d at 331.

## A

To resolve that issue, we begin with the constitutional violation prong of the QI analysis. We accordingly consider whether Nissen violated Ambler's Fourth Amendment right to be free from excessive force. Recovering under an excessive force theory requires that Plaintiffs prove "(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009) (quoting *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007)). No one disputes the first element—and for good reason. Ambler, after all, suffered more than injuries; he died as officers tried to arrest and detain him.

The crux of the parties' dispute instead concerns the force Nissen used to subdue Ambler and whether such force was clearly excessive or unreasonable. Collapsing these questions into a single inquiry, the district court found that Plaintiffs raised material fact issues about whether the level of force Nissen used was appropriate given the circumstances of the encounter. It reached that conclusion after considering the "totality of the circumstances" from the "perspective of a reasonable officer on the scene" and the well-established *Graham* factors, named after the Supreme Court case bearing the same name. *Graham v. Connor*, 490 U.S. 386, 396 (1989). We address the district court's reasoning and the parties' arguments below.

No. 23-50696

1

One *Graham* factor relevant to the excessive force inquiry considers the severity of the arrestee's crime. *Id.* In Nissen's view, the district court's Fourth Amendment analysis deemphasized this issue and, by extension, key portions of our precedent. Doing so, according to Nissen, was reversible error. In making his argument, Nissen points to our ruling in *Salazar v. Molina*, 37 F.4th 278 (5th Cir. 2022), a case involving a suspect who, like Ambler, led officers on a high-speed chase. The chase in *Salazar* culminated in the subject stopping and exiting his vehicle, and then lying on the ground, presumably in an act of surrender. *Id.* at 280. Despite the suspect's submission, however, a sheriff's deputy immediately tased him. The arrestee later sued, alleging excessive force. *Id.* We concluded that the arrestee's claim was meritless, partly because the suspect could have posed a serious safety threat after dangerously evading capture. *Id.* at 282.

Nissen claims here that Ambler similarly posed a serious threat of bodily injury after leading officers on a dangerous chase. And like the circumstances in *Salazar*, Nissen asserts that any reasonable officer would believe that Ambler was an ongoing threat until he was restrained in handcuffs. Nissen accordingly contends that he is entitled to judgment as matter of law on Plaintiffs' excessive force claim. We hold a different view. For one thing, the district court's ruling did not undermine the significance of the high-speed pursuit—nor could it, as the state of Texas considers evading arrest via high-speed chase a felony, Tex. Penal Code § 38.04, and the helicopter footage clearly shows Ambler weaving in and out of traffic, jeopardizing the safety and wellbeing of others, *see Salazar*, 37 F.4th at 281–82.

But, for another, the Fourth Amendment analysis considers the facts and circumstances of each challenged encounter. *See Graham*, 490 U.S. at

396. And although some of *Salazar*'s factual details parallel Ambler's initial evasion, what happened after the pursuit in each case is meaningfully distinct. Of particular note, the officers in *Salazar* encountered the unrestrained suspect mere seconds after the chase ended. *Id.* at 280. Such a timeframe and scenario are unlike those at issue here: Nissen entered the arrest scene nearly one minute after the chase. On arrival, Nissen witnessed several officers surrounding Ambler's body with one officer pointing a taser to Ambler's neck. Distinguishing matters further, Ambler was gasping as he presumably underwent a medical emergency, all the while repeating "I have congestive heart failure," and "I can't breathe."

Relying on these distinctions, the district court believed a separate *Graham* factor outweighed the severity of Ambler's initial crime—that is, Ambler's immediate threat of danger. *Graham*, 490 U.S. at 396. The court specifically held that the record raised a genuine issue of "material fact as to whether a reasonable officer would believe that [Ambler] . . . was subdued [or] an immediate threat to safety when Nissen began helping handcuff him." The video footage does not blatantly contradict that holding. *Scott*, 550 U.S. at 380. True enough, Ambler engaged in dangerous behavior before his arrest. Even still, based on the district court's factual findings, a reasonable jury could conclude that Ambler lacked a means to evade custody when Nissen entered the scene. *See Joseph*, 981 F.3d at 335 ("If the suspect lacks any means of evading custody—for example, by being pinned to the ground by multiple police officers—force is not justified."). A reasonable jury could therefore conclude that Ambler posed little or no threat to Nissen or others during the arrest. *See id.* The fact issues identified by the district court in this context were therefore material to Plaintiffs' Fourth Amendment claim. And we lack jurisdiction to consider anything more. *See id.* at 331.

No. 23-50696

2

Another *Graham* factor relevant to the excessive force inquiry is whether Ambler was resisting or evading arrest by flight. *Graham*, 490 U.S. at 396. According to Nissen's testimony, he was unaware whether Ambler had been compliant before coming to the scene. But Nissen said that, after he arrived, it was "clear" that Ambler was not complying with commands; he was "physically resisting [Nissen's] efforts to place his hands behind his back." Plaintiffs view the facts differently. They contend that Ambler was not resisting but instead "instinctively putting one arm on the ground to try to breathe." For its part, the district court held that the videos did "not provide the clarity necessary to resolve the factual dispute presented by the parties' conflicting accounts."

On appeal, Nissen contests the district court's characterization, reasoning that any reasonable officer would have believed Ambler was resisting authority. Although Ambler alerted the officers about his inability to breathe, Nissen says he need not have credited "Ambler's statements that he was having a medical emergency." Nissen again references Ambler's choice to evade arrest by vehicle, explaining that an officer could have reasonably been concerned about the sincerity of Ambler's appeals. "When a suspect has put officers and bystanders in harm's way," Nissen stresses, "it is reasonable for officers to question whether the now-cornered suspect's purported surrender is a ploy." *See Salazar*, 37 F.4th at 282.

Applying such reasoning without context, however, would undermine the fact-specific nature of the excessive force analysis. After all, a criminal's choice to engage in unreasonable behavior does not give officer license to do the same. To the contrary, an officer must use a "justifiable level of force in light of the continuing threat of harm that a reasonable officer could perceive." *Id.* at 283. And in this case, "the issue of whether reasonable

officers in this situation would have credited the warnings from [Ambler] . . . is a factual question that must be decided by a jury." *Darden v. City of Fort Worth*, 880 F.3d 722, 730 (5th Cir. 2018).

None of that means that Nissen acted unreasonably as a matter of law. Perhaps Ambler was indeed refusing to submit to the officers by pulling his body away from the ground, and perhaps Nissen responded in a reasonable manner. But viewing the evidence in Plaintiffs' favor as we must, however, it is just as believable that their allegations are correct, and Ambler was in a struggle for his life. In either case, such a dispute is reserved for a jury, not summary judgment. Fed. R. Civ. P. 56(a) (stating that a "court shall grant summary judgment if the movant *shows that there is no genuine dispute* as to any material fact."). Because the court correctly considered the legal significance of the factual disputes, we end our inquiry on this issue here. *See Joseph*, 981 F.3d at 331.

B

To supplement their Fourth Amendment allegations, Plaintiffs next contend that Nissen's use of restraint was an application of deadly force. Such a theory "is treated as a special subset of excessive force claims." *Aguirre v. City of San Antonio*, 995 F.3d 395, 412 (5th Cir. 2021). And like the excessive force analysis above, this particular inquiry still calls for an objective reasonableness standard, *see Scott*, 550 U.S. at 382–83, even though the analysis includes an added layer: Analyzing the validity of a deadly force allegation involves a two-pronged test. The first part asks "whether the force used constituted deadly force"; the second considers "whether the subject posed a threat of serious harm justifying the use of deadly force." *Timpa v. Dillard*, 20 F.4th 1020, 1028 (5th Cir. 2021). Applying both prongs to the facts here, the district court denied Nissen summary judgment. On appeal,

Nissen contends that the district court's holding was in error and contradicted by video evidence.

Nissen focuses his challenge on the first prong of the analysis—whether the force used was deadly. Even though he concedes that deadly force was unwarranted in Ambler's case, he nevertheless avers that the force he applied was not deadly to begin with. In Nissen's telling, he was using "minimal force" or "soft hand force" to place Ambler into handcuffs. That Ambler died because of such minimal restraint was merely accidental and mainly the result of Ambler's poor health. Nissen reasons that it was unforeseeable that applying "soft hand force" would result in an injury, let alone death. In support of this argument, Nissen points to video footage that he argues "conclusively shows that no officer was using deadly force to try and kill Ambler."[4] As the video depicts, Nissen restrained Ambler for 90 seconds. Compared with other deadly force cases, Nissen explains that such a period was minuscule. Indeed, two similar cases the district court referenced involved officers who restrained decedents for at least five minutes. *See, e.g.*, *Aguirre*, 995 F.3d at 413 (five minutes); *Timpa*, 20 F.4th at 1028 (fourteen minutes).

Nissen believes that no reasonable officer would have known that using force on Ambler for such a brief period would lead to his death. He contends that any conclusion otherwise would essentially require denying QI in all cases involving an accidental death. Such a result, in Nissen's telling, would trade the Fourth Amendment's general reasonableness standard for

---

[4] We note that the test isn't whether an officer was *trying* to kill Ambler, but whether the force is deadly—that is, could have killed him. *See Scott*, 550 U.S. at 381.

an outcome-oriented one that contravenes Supreme Court authority. *See Scott*, 550 U.S. at 383. ("Whether or not [the officer's] actions constituted application of 'deadly force,' all that matters is whether [the officer's] actions were reasonable.").

At least in this case, however, Nissen's fears are unfounded. As a threshold matter, whether a use of force is "deadly" is a question of fact. *Flores*, 381 F.3d at 399 ("We lack jurisdiction to review the district court's factual finding that [the officer] used deadly force."). The question is whether a jury could find that the use of force "carr[ied] with it a substantial risk of causing death or serious bodily harm." *Timpa*, 20 F.4th at 1032 (quoting *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998)). And the district court here identified specific material fact issues precluding summary judgment. For example, it considered the recorded footage of the encounter. As noted, the video shows an obese Ambler stating: "I have congestive heart failure" and twice exclaiming "I can't breathe." Nissen himself even acknowledged that one "obvious pitfall[] of [a suspect lying face down] is, you know . . . people could be at risk for positional asphyxiation."

The district court also considered expert reports. The medical examiner who performed Ambler's autopsy determined that Ambler's death was a homicide and found that it was caused by "congestive heart failure and cardiovascular disease associated with morbid obesity in combination with forcible restraint." Plaintiffs' medical expert further opined that Ambler died from "a vicious cycle of respiratory distress from hypertensive crisis and worsening heart failure pushed to physiological extremes by subsequent tasing and forcible restraint."

And while Nissen's maneuver on a healthy plaintiff may have resulted in no injury at all, it is well established that state actors who unlawfully use excessive force take their victims as they find them. *Darden*, 880 F.3d at 728.

Although that standard does not make minimal force excessive when used on an eggshell plaintiff, a claimant may nevertheless prevail on an excessive force claim if a reasonable officer would be aware of a preexisting health issue and then aggravates it. *See Windham v. Harris Cnty.*, 875 F.3d 229, 242 (5th Cir. 2017) ("Our law is clear that the second [excessive force] prong does not 'preclude [] recovery for aggravation of preexisting injury caused by the use of excessive force.'") (second alteration in the original). In this case, the court identified enough evidence to conclude that a reasonable officer could have been aware of Ambler's health issues giving his obvious size and pleas for air. *See, e.g., Timpa*, 20 F.4th at 1033 (holding that reasonable jury could find "use of a prone restraint with bodyweight force on an individual with three apparent risk factors—obesity, physical exhaustion, and excited delirium—'created a substantial risk of death or serious bodily injury.'" (quoting Gutierrez, 139 F.3d at 446)). This was so even if Nissen applied force for a mere ninety seconds.

Perhaps Nissen heard Ambler's cries. Perhaps he did not. And perhaps Nissen's use of force, in his mind, was minimal given the context. But the issues here do not turn on Nissen's subjective appraisals; the relevant inquiry is whether a "reasonable officer" would consider applying Nissen's level of force in the same situation. *See Graham*, 490 U.S. at 396. The district court acknowledged this reality and, to that end, did not legally err as a result. If anything, the district court's holding demonstrates precisely why these Fourth Amendment cases are fact intensive: Not all plaintiffs are the same, and harmless force in one situation could be deadly force in another. While Nissen would have us disregard the context of his encounter with Ambler, doing so would trade nuance for willful blindness. And contrary to his view, such an approach is incompatible with the Fourth Amendment reasonableness standard. *See Graham*, 490 U.S. at 396 ("Because 'the test of reasonableness under the Fourth Amendment is not capable of precise

definition or mechanical application,' however, its proper application requires careful attention to the facts and circumstances of each particular case[.]") (citation omitted) (quoting *Bell v. Wolfish,* 441 U.S. 520, 559 (1979))).

In sum, the district court's factual findings regarding a Fourth Amendment violation support its legal conclusions. We lack jurisdiction to "second guess" anything more. *See Joseph*, 981 F.3d at 331.

## IV

Excessive force aside, Plaintiffs' other basis for establishing § 1983 liability stems from Nissen's alleged failure to intervene. According to Plaintiffs, Nissen is liable under this theory because he was "present at the scene and [did] not take reasonable measures to protect a suspect from another officer's use of excessive force." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995). Section 1983 claimants may succeed on these "bystander liability" claims when the officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley v. Hanna*, 726 F.3d 631, 330 (5th Cir. 2013) (cleaned up). In resolving whether a bystander liability claim is viable, courts also consider whether an officer "acquiesce[d] in" the alleged constitutional violation. *See Hale*, 45 F.3d at 919.

When addressing Plaintiffs' allegations here, the district court identified a genuine dispute of material fact as to whether Nissen failed to reasonably intervene. Relying on video evidence and testimony, the court found that Nissen helped with the arrest after he cleared Ambler's vehicle. It further pointed to evidence showing that Nissen heard Ambler say he had congestive heart failure and repeatedly say he could not breathe. Based on Nissen's proximity and the duration of force, the court concluded that a

reasonable jury could find that Nissen had an opportunity to intervene. Nissen disagrees.

As a threshold issue, Nissen stresses that he cannot be liable for the force other officers used outside his presence. As for the force they used after he arrived, Nissen claims it was insignificant. He argues that videos reveal that he saw Ambler tased only once by the deputies—and this occurred as they tried rolling Ambler back onto his stomach after Ambler had "effectively resisted all three officers." In Nissen's telling, it was impossible for him to know how Ambler acted between the time the crash occurred and his arrival on the scene. As a policy matter, Nissen contends that courts should give leeway to late-arriving officers because they must make split-second assumptions based on incomplete information. *See Chivers v. Reaves*, No. 1:13-CV-00171, 2017 WL 4296726, at *27 (D. Utah Sept. 26, 2017) (holding that "[i]t [was] plain that a reasonably prudent officer arriving on scene with limited information would be justified in assuming that . . . [a plaintiff] [was a] potential threat[].").

While it might be true that Nissen's actions were reasonable, the video evidence here does not blatantly contradict Plaintiffs' version of events or the district court's findings. Plaintiffs allege that Nissen had every reasonable opportunity to mitigate and stop the use of force once he arrived at the active arrest. After all, Plaintiffs note, Nissen had at least two minutes when he was within arm's reach to realize that Ambler was not resisting and posed no threat. Based on the video footage, Plaintiffs say Nissen was in earshot of Ambler to hear his breathing and pleas for help. Nissen was also present as the deputies tased Ambler at least once. It is true that Nissen's expert report explained that the other officer's taser was set to a mode that "does not penetrate deeply enough to affect any human muscles or organs." But as the district court found, Plaintiffs' expert concluded that Ambler died from "a vicious cycle of respiratory distress from hypertensive crisis and worsening

heart failure pushed to physiological extremes by subsequent tasing and forcible restraint."

Given those contradicting facts, the court held that a jury could reasonably determine that Nissen had an opportunity to stop the excessive force but failed to do so. We agree that the factual disputes the district court identified are material. Ambler's pleas for help, coupled with his arguably obvious medical distress, may have alerted a reasonable officer to intervene in the ordeal to stop the tasing and continued use of force. *See, e.g.*, *Carroll v. Ellington*, 800 F.3d 154, 178 (5th Cir. 2015) (affirming denial of summary judgment when it was disputed whether officer was present for taser strikes of restrained individual). We have no authority to engage Nissen's arguments further on this claim because they turn on factual disputes alone.

## V

Our analysis does not end after a plaintiff clears QI's first hurdle. As noted above, plaintiffs must also meet the "clearly established" prong to avoid summary judgment. Doing so requires them to point to a case where an official, faced with similar circumstances as the defendant, was held to have violated the Constitution. *White v. Pauly*, 580 U.S. 73, 79 (2017). Although the law can be clearly established "despite notable factual distinctions between the precedents relied on and the cases then before the Court," *Hope v. Pelzer*, 536 U.S. 730, 740 (2002), relying on generalized principles is not enough: The pertinent decisions must give "reasonable warning that the conduct then at issue violated constitutional rights" *White*, 580 U.S. at 79.

## A

We first address excessive force. Citing *Darden v. City of Fort Worth*, 880 F.3d at 733–34, the district court held that Nissen violated clearly established law. In *Darden*, officers performed a no-knock raid to execute a

narcotics warrant inside a residence. During his subsequent arrest, arrestee Darden was thrown to the ground, tased, choked, and punched. He was "obese" and died from a "heart attack" during the encounter. *Id.* at 725. Throughout Darden's arrest "other people in the residence were repeatedly yelling that Darden could not breathe." *Id.* at 726. A unanimous panel of this court held it clearly established that "the degree of force an officer can reasonably employ is reduced when an arrestee is not actively resisting." *Id.* at 733 (collecting cases). Because *Darden* was issued years before the relevant encounter here, the district court held that it applied to this case; Nissen, according to the district court, was therefore on notice that it was unlawful to use excessive force against a person who was on the ground, not resisting, and possibly unable to breathe.

Nissen disputes that holding, arguing that the district court's rehashing of *Darden* "glossed" over the relevant facts without considering the relevant distinctions. Most importantly, Nissen explains, the *Darden* court held that the force used on an arrestee was excessive partly because he "was not suspected of committing a violent offense." *Id.* at 729 (citation omitted). That issue alone, Nissen thinks, makes *Darden* counterfactual to the case here. Indeed, Nissen argues that Ambler was suspected of committing a crime that revealed an abject intention to endanger others and escape at all costs.

In making his argument, however, Nissen seems to suggest that Ambler continued fleeing throughout the encounter, despite the clear video evidence suggesting otherwise. To be sure, "where a suspect initially resists, force must be reduced once he has been subdued." *Bagley v. Guillen,* 90 F.4th 799, 803–04 (5th Cir. 2024) (internal quotation marks, alteration, and citation omitted). As explained above, there is a fact dispute about whether Ambler was subdued when Nissen arrived on the scene. If Ambler was indeed compliant and not resisting arrest, then the continued use of force,

particularly after Ambler said he had congestive heart failure and could not breathe, necessarily would be excessive. *See id.*; *see also Timpa*, 20 F.4th at 1038 (determining that law in 2016 clearly established that if plaintiff was "subdued and nonthreatening by nine minutes into the restraint, then the continued use of force for five additional minutes was necessarily excessive"). To that end, such a circumstance would, as the district court found, parallel *Darden*. On that basis, the district court did not commit legal error.

## B

Turning last to Plaintiffs' § 1983 bystander claim on QI's second prong, the district court held that an officer violates clearly established law in excessive force cases if the officer "knew a constitutional violation was taking place and had a reasonable opportunity to prevent the harm." *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017). In this context, the district court concluded that tasing someone who is subdued and does not pose a threat can constitute excessive force. *See Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013); *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012).

On appeal, Nissen again points to Ambler's decision to flee from police by motor vehicle. He contends that no clearly established case put Officer Nissen on notice that the deputies—in subjecting Ambler to a taser and prone restraint after a high-speed chase—violated Ambler's constitutional rights. But, again, the district court identified a fact dispute about whether Ambler was visibly undergoing a medical emergency when Nissen arrived at the active arrest. It also found a dispute about whether Nissen had time to decide that force was not necessary and try to stop it. *See Hamilton*, 845 F.3d at 663. If Plaintiffs' view of the encounter prevails at trial, Nissen had fair notice that participating in another officers' use of excessive force gives rise to liability. *See, e.g.*, *Carroll*, 800 F.3d at 178 (affirming denial

of summary judgment where it was disputed whether officer was present for taser strikes of restrained individual); *Timpa*, 20 F.4th at 1039 (holding that it was clearly established in 2016 that officers who stood "mere feet away" from plaintiff during fourteen-minute restraint were subject to bystander liability). The district court did not legally err in reaching that conclusion.

\*    \*    \*

One final point bears mentioning. In reaching our conclusion today, we deferred to the district court's sound identification of genuine factual disputes and reserved the weighing of evidence for the jury's capable hands. In doing so, we have not only allowed the district court space to do its job, but we have given jurors the space to do theirs. *See Joseph*, 981 F.3d at 331. So, for all the dissent's inflammatory rhetoric, it makes at least one salient point: The majority's ruling indeed "serves . . . this plaintiff." *See post*, at 15. Absent from the dissent's observation, however, is the value our decision offers this defendant. A restrained judiciary, after all, benefits all parties in equal measure. In the dissent's view, our decision today in this interlocutory appeal will lead to an endless parade of horribles. But to the extent the dissent's concerns are valid, it should direct its criticisms at the Federal Rules of Civil Procedure, *see* FED. R. CIV. P. 56(a), or Supreme Court authority, *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), not this opinion. *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

## VI

As outlined above, Nissen fails to raise pure legal issues and instead challenges the district court's factual findings. Nissen has therefore failed to invoke this court's limited interlocutory jurisdiction and this appeal is

accordingly DISMISSED. This case is REMANDED for further proceedings.

No. 23-50696

JERRY E. SMITH, *Circuit Judge,* dissenting:

The majority, albeit with the most wholesome of intentions, preaches that qualified immunity is "a defense that shields state officials from being held accountable for their misconduct." Op. at 5 (citation omitted). Given that opening, what follows is no surprise.

In the wake of a high-speed chase involving three crashes and triple digit speeds, Officer Michael Nissen used a modicum of force to restrain Javier Ambler. Nissen spent about a minute controlling Ambler's hand—without touching any other part of his body—and then no more than 20 seconds applying pressure to Ambler's upper back and head. That is hardly anything out of the ordinary, especially in the immediate aftermath of Ambler's extended and reckless flight from justice that endangered the public, the officers, and Ambler himself. Indeed, that is precisely the type of controlled and measured response we expect from police reacting to a manifestly dangerous suspect. Tragically, in part because of an imperceptible medical condition, Ambler died during the arrest as a result of the restraint.

Qualified immunity exists for just this sort of a case. A police officer made an appropriate, split-second judgment about reasonable force in light of the gravity of the situation and is now tied up in a federal lawsuit, facing possible civil damages, because of it. Yet the majority jettisons QI for officers who do just that.

Because the majority makes it impossible for officers to receive qualified immunity in cases of accidental death, no matter how reasonable their use of force was in context, I respectfully dissent.

## I.

Some of the majority's errors stem from its misconception of the appropriate standard of review. It avers that "judging the genuineness of the

No. 23-50696

district court's factual findings (i.e., whether they exist) is off limits." Op. at 4 (citation omitted). Yet, though some judges, in error, have suggested that we are forbidden to do so,[1] "we are permitted to review genuineness where, as here, video evidence is available." *Argueta v. Jaradi*, 86 F.4th 1084, 1088 (5th Cir. 2023) (citations omitted). There are multiple, clear videos of what happened. Therefore, reviewing the district court's determinations of genuineness is not off the table.

## II.

One might charitably express a narrow version of what the majority advances as follows:

> Ambler died. Deadly force is a question of fact. There is no question that if Nissen had walked up and shot Ambler in the head he would be liable. So deadly force is obviously material. Ergo, we deny QI.

The practical problem is two-fold. *First,* the majority essentially eliminates qualified immunity in cases of accidental death, almost all of which are situations where deadly force is not warranted. If it were warranted, they would likely not be *accidental*. That means "whether force is deadly" will almost always be material in accidental-death cases. Since deadliness is a fact question, a defendant will never get QI.

That is error. If we accept the basic rationale behind qualified immunity, this sort of an accidental-death case is squarely within its heartland. But instead, the majority's rationale categorically eliminates QI from this set of cases.

---

[1] *See Argueta v. Jaradi*, 94 F.4th 475, 476–81 (5th Cir. 2024) (Douglas, J., dissenting from denial of rehearing en banc).

No. 23-50696

*Second*, the majority's reasoning creates a perverse incentive for police to use deadly force when it is justified, even if the situation can be de-escalated. This case is the perfect example: To avoid liability, Nissen should have shot Ambler during the chase (when deadly force was more likely justified to protect the public). In the majority's view, waiting and trying to defuse the situation with minimum force increased, counterintuitively, Nissen's risk of liability. That is an odd result, indeed.

Obviously, we are not policymakers, so none of the above matters on its own accord. I offer it only to demonstrate the grave consequences of the majority's legal error.

## II.

And what a legal error! Nissen should receive qualified immunity from both claims at both prongs of the standard QI analysis.

## A.

Nissen did not use constitutionally excessive force.

## 1.

In excessive-force claims, the reasonableness of an officer's conduct depends on the "facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."

*Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). These are the so-called *Graham* factors, each of which supports Nissen's use of force against Ambler.

The majority agrees that the first *Graham* factor supports Nissen. It rightly notes that "the state of Texas considers evading arrest via high-speed

chase a felony, Tex. Penal Code § 38.04, and the helicopter footage clearly shows Ambler weaving in and out of traffic, jeopardizing the safety and well-being of others." Op. at 7 (citation omitted). The majority wrongly emphasizes the district court's weighing of the factors. "[T]he ultimate determination of Fourth Amendment objective reasonableness is a question of law." *White v. Balderama*, 153 F.3d 237, 241 (5th Cir. 1998) (per curiam) (citation omitted). Therefore, we may freely weigh the first *Graham* factor in favor of Nissen.

The majority does not grapple with the degree to which this factor supports Nissen's use of force. Undeterred by multiple crashes, Ambler continued to flee at triple-digit speed through residential neighborhoods—gravely endangering many innocent lives to evade a routine traffic stop. This weighs strongly in favor of Nissen.

### 2.

On to the second *Graham* factor, "whether the suspect poses an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. The majority suggests that there is a genuine dispute of material fact "whether a reasonable officer would believe that [Ambler] . . . was subdued [or] an immediate threat to safety when Nissen began helping handcuff him." Op. at 8 (citation omitted). But this factor—which may or may not be the most important in this context[2]—"is a question of law left to the court." *Argueta*, 86 F.4th at 1092. And with the benefit of two videos of Ambler's arrest, this factor readily resolves in favor of Nissen.

---

[2] "[T]he second factor—whether there is an immediate threat to safety—is generally the most important factor in determining the objective reasonableness of an officer's use of deadly force." *Baker v. Coburn*, 68 F.4th 240, 247–48 (5th Cir. 2023) (citation omitted). I will address the argument that this was a use of deadly force.

There are several reasons why a reasonable officer in Nissen's position might act as he did. *First*, Ambler had just come from of a high-speed chase fleeing a traffic stop for failure to dim his high beams. That suggests (1) that Ambler had little to no regard for the lives of others, (2) that Ambler had a demonstrated willingness to flee the police at all costs, and (3) that maybe this was not just about a minor traffic infraction. Maybe Ambler had something else in the car that heightened his desire to flee. Maybe he was mentally ill or on drugs. Each of these is a meaningful possibility that a reasonable officer would consider. Ambler's flight alone makes this *Graham* factor weigh in favor of Nissen.

But the flight was not the only fact known to Nissen from which he could have reasonably inferred Ambler's dangerousness. *Inter alia*, Ambler—at 410 pounds—was a very large individual, who was still unrestrained and feet from an unsearched car, despite the efforts of multiple other police officers who had deployed a taser. It boggles the mind to think that a reasonable officer would not perceive Ambler as a meaningful threat.

Resisting this conclusion, the majority attempts to distinguish *Salazar v. Molina*, 37 F.4th 278 (5th Cir. 2022), in which, after a considerably less dangerous chase,

> Salazar abruptly stopped his vehicle. He quickly got out, dropped to his knees next to the car, and raised his hands. He then lay on the ground with arms above his head and legs crossed. Five seconds after stopping his car, Salazar was lying prone on the ground.

*Id.* at 280. Despite the clear surrender, the police tased Salazar. Our court rejected Salazar's excessive force claim, holding that

> when a suspect has put officers and bystanders in harm's way to try to evade capture, it is reasonable for officers to question whether the now-cornered suspect's purported surrender is a

ploy. That's especially true when a suspect is unrestrained, in close proximity to the officers, and potentially in possession of a weapon.

*Id.* at 282. Here, "[Ambler] ha[d] put officers and bystanders in harm's way to try to evade capture." *Id.* He was also "is unrestrained, in close proximity to the officers, and potentially in possession of a weapon." *Id.*[3]

The majority attempts to distance itself from *Salazar*: "Distinguishing matters further, Ambler was gasping as he *presumably* underwent a medical emergency, all the while repeating 'I have congestive heart failure,' and 'I can't breathe.'" Op. at 8 (emphasis added). But what the majority labels a distinction is the central analogy. The majority gets the presumption precisely backward. In the context of this sort of a chase, when a reasonable officer hears Ambler's pleas, he reasonably assumes "ploy," not "medical emergency." *See Salazar*, 37 F.4th at 282. Or, at the very least, he is reasonably entitled to make that presumption.[4]

The majority fixates on one other aspect of Ambler's situation, that "a reasonable jury could conclude that Ambler lacked a means to evade custody when Nissen entered the scene." Op. at 8 (citation omitted). This falls

---

[3] I grant that whether Ambler was "potentially in possession of a weapon" is the weakest point of comparison. But it is not inconceivable, given Ambler's size and proximity to the relatively unsearched car. More importantly, this is just one of many factors that heighten the already reasonable assumption that Ambler's actions were a ploy. That's especially true when every single one of the other facts mentioned in this holding from *Salazar* is on all fours with this case.

[4] The majority also points to Nissen's comparatively late arrival, though it admits the difference between the cases is measured in mere seconds. The majority does not explain why time of arrival—especially when still so close to the initial contact—matters in applying the *Salazar* presumption. The *Salazar* presumption is that somebody who is willing to flee at great cost to others might also be willing to lie to officers to get out of a tricky spot. Why that has anything do with a difference in arrival times escapes my imagination.

properly under the third *Graham* factor, "whether he is actively resisting arrest or attempting to evade arrest by flight," 490 U.S. at 396, so I will address it there.

But factor two—"whether the suspect poses an immediate threat to the safety of the officers or others," *id.*—unambiguously favors Nissen.

### 3.

Thus far, we are faced with an unrestrained suspect who poses a substantial threat to officers in the wake of a serious crime indicating a very low regard for human life. Those factors alone justify Nissen's light-touch application of force to Ambler.

The final *Graham* factor is "whether he is *actively resisting arrest* or attempting to evade arrest by flight." *Id.* (emphasis added). I agree with the majority that any attempt by Ambler to flee the scene would have likely failed.[5] But the third *Graham* factor includes "actively resisting arrest." *Id.* And it's hard to characterize Ambler's actions as anything other than that. Two minutes and fifteen seconds pass between the time the first officer makes physical contact with Ambler and the time the handcuffs click. In those two-plus minutes, Ambler ignored command after command, continuously and rather obviously providing physical resistance to the multiple officers trying to cuff him. It does not get more clear-cut than that.

Yet the majority proffers two objections to the clarity of this situation. First, the majority concludes that "a reasonable jury could conclude that Ambler lacked a means to evade custody when Nissen entered the scene." Op. at 8 (citation omitted). Its best authority for the relevance of that

---

[5] Though this is only because of multiple officers' applying to Ambler the precise sort of force that the majority finds objectionable.

conclusion is an absurdly overbroad reading of *Joseph v. Bartlett*, 981 F.3d 319, 335 (5th Cir. 2020).

*Joseph* held that "[i]f the suspect lacks any means of evading custody—for example, by being pinned to the ground by multiple police officers—force is not justified." *Id.* The only way that might matter in this case is if one reads the court to be imposing a categorical bar on the use of any force when a suspect is on the ground. But that is quite clearly not what *Joseph* stands for.

First, the language immediately before this passage makes it plain that subduing a suspect means that officers must reduce but not necessarily cease force. Second, it conditions that reduction in force to require the actual subduing of the suspect. And Ambler was far from subdued. That differs significantly from the situation in *Joseph*.[6] And third, even if Nissen's toes edged beyond the boundary set forth in *Joseph*, we don't jettison the other *Graham* factors—which obviously and strongly support a robust use of force in this case.[7]

---

[6] In *Joseph*, a schizophrenic man who had been seen standing by a middle school jumped behind a convenience store counter while avoiding the police. He promptly crumpled into the fetal position. Then, "Officer Martin, weighing 300 pounds, immediately placed his full weight onto Joseph, who was still lying on the floor with his legs bent toward his chest." 981 F.3d at 326. And the use of force continued for some time, including "deploy[ing] [a] taser for eleven seconds," "jabb[ing] [a baton] downward, striking Joseph at least twice with the pointed end," tasing for another three seconds, "kick[ing] Joseph twelve to thirteen times while holding onto the counter," "punching Joseph in the head three times," "drag[ging] Joseph toward [a] wider area," then "punch[ing] Joseph in the face [another] three times," and closing out the "scrum" with "punch[ing] Joseph in the head [yet another] six times." *Id.* at 326–27. Read in context, the court was concerned about the timing of all this in relation to the initial pinning. *See id.* at 335.

[7] Especially relative to *Joseph*—in which the police used significantly more force against a significantly less dangerous person because of a far less serious offense. *See supra* note 5.

No. 23-50696

Second, the majority attempts to distinguish *Salazar* by appealing to "the fact specific nature of the excessive force analysis." Op. at 9. Beyond this vague handwringing, we get very little. Presumably, the majority means to impute its attempt to distinguish *Salazar* under the second *Graham* factor here. But that distinction proves the central analogy between the cases on the third factor, just as it does on the second factor. Indeed, the third *Graham* factor also implicates reasonable concerns about the genuineness of a surrender. *See Salazar*, 37 F.4th at 284. Because Nissen could reasonably doubt the genuineness of Ambler's pleas, he could reasonably interpret Ambler's attempts to move away from officers as resistance rather than as "a struggle for his life." Op. at 10.[8]

Because all three *Graham* factors support Nissen, Ambler's excessive-force claim fails on the first prong of qualified immunity.

4.

The majority separately treats plaintiffs' claims of deadly force. That methodology is error as a matter of law. Though "[c]laims that law enforcement unreasonably utilized deadly force are treated as a special subset of excessive force claims," *Aguirre v. City of San Antonio*, 995 F.3d 395, 412 (5th Cir. 2021), the constitutional inquiry is still governed by the *Graham* factors.[9]

The majority relied on the important decision in *Tennessee v. Garner*, 471 U.S. 1, 3 (1985), to obscure the relevant analysis. In particular, the

---

[8] And that's assuming Ambler's actions were ambiguous. But they were not.

[9] All that changes is which factors are emphasized. "When an officer uses deadly force, the second *Graham* factor is generally the most important." *Singleton v. Casanova*, No. 22-50327, 2024 WL 2891900, at *31 n.17 (5th Cir. June 10, 2024) (unpublished) (citation and internal quotation marks omitted).

No. 23-50696

majority reads *Garner* to establish some sort of threshold inquiry in deadly-force cases: "Deadly force is objectively unreasonable 'unless it is necessary to prevent [a suspect's] escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" Op. at 10 (quoting *Garner*, 471 U.S. at 3). That is error twice over.

*First*, the Supreme Court has flatly rejected this errant reading of *Garner*. *See Scott v. Harris*, 550 U.S. 372, 382 (2007). Indeed, "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'" *Id.* Instead, "Whether or not [Nissen]'s actions constituted application of 'deadly force,' all that matters is whether [Nissen]'s actions were reasonable." *Id.* at 383. Having already applied the *Graham* factors and found that each one favors Nissen, that ends our inquiry.

*Second*, the majority curiously recontextualizes *Garner*'s language to untether it from *Garner*'s very different set of facts. In full, the passage from *Garner* reads,

> This case requires us to determine the constitutionality of the use of deadly force to prevent the escape of an apparently unarmed suspected felon. We conclude that such force may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.

*Garner*, 471 U.S. at 3 (emphasis added). The use of "such" harkens back to the facts of that case, which involved shooting a fleeing suspect with live rounds to prevent his escape. *See id.* at 4. That sort of force that is very different from what was present here, and consequently it calls for a different sort of inquiry.

No. 23-50696

In short, none of the facts raised by the majority in this section materially bears on whether Nissen's actions were reasonable in light of the *Graham* factors. Whether Nissen heard Ambler does not matter because Nissen could reasonably disregard Ambler's complaints in the context of his flight. Whether Nissen's actions did or did not *in fact* lead to Ambler's death, as the medical examiner suggested, doesn't matter because it does not cast doubt on the reasonableness of Nissen's split-second decisions at the time of the accident. Even Nissen's admission about the risks of the prone position in the abstract does not matter because of the negligible amount of time Nissen forced Ambler to be quasi-prone in this case. That such a position "could be" dangerous to "some people" "depending on the situation" is not enough to send this case to trial.[10]

In Nissen's words,

> In this specific situation, Mr. Ambler's size was certainly a consideration that I had when I was attempting to take him into custody, but the other part of that, what they also teach us at the Academy is that you have to weigh those considerations against the situation that you are facing. So in this situation, where I am assisting trying to take an individual into custody who just spent the last 20-or-so minutes driving recklessly through the City of Austin, crashing multiple times, I had to weigh the risk of not taking him into custody quickly against what possible health conditions he may or may not have had.

Nissen's testimony confirms what the video plainly shows—that he acted reasonably.

---

[10] In this way, the majority arbitrarily denies QI to officers in another category of situations. As soon as a suspect goes prone, for however long, if the suspect happens to die later, the case must go to trial. That would be a bizarre result, but seemingly one that the majority's reasoning dictates.

No. 23-50696

## B.

We should also extend qualified immunity because the law is not clearly established. The majority only gets to "clearly established" by stringing together several cases—none of which contains all the major facts in this case—at an inappropriately high level of generality. But applying the appropriate level of generality is central to this part of the QI inquiry:

> What clearly established means depends largely upon the level of generality at which the relevant legal rule is to be identified. An official does not lose qualified immunity merely because a certain right is clearly established in the abstract. Officials should receive the protection of qualified immunity unless the law is clear in the more particularized sense that reasonable officials should be on notice that their conduct is unlawful.

*Cantrell v. City of Murphy*, 666 F.3d 911, 919–20 (5th Cir. 2012) (cleaned up). Recall the high bar required to deny QI: "Qualified immunity is justified unless *no* reasonable officer could have acted as Officer [Nissen] did here, or *every* reasonable officer faced with the same facts would" have acted differently. *Mason v. Faul*, 929 F.3d 762, 764 (5th Cir. 2019).

The law is not clearly established because there is no case that is factually similar, even at a low level of generality. The majority fails to identify a single decision that found an excessive-force violation based on (1) controlling a subject in the aftermath of a high-octane chase; (2) let alone an unhandcuffed subject in the aftermath of a high-octane chase; (3) and a subject who crashed and resumed his attempt at escape several times; (4) and whose car had not yet been searched; (5) and who was an exceedingly large individual (6) who'd been able to avoid being handcuffed despite the efforts of multiple able-bodied police officers. Keep in mind this was all over a busted light. Ambler's desperate attempt to escape suggests any number of additional facts that justify Nissen's actions.

> The majority leans on *Darden*:
>
> In *Darden*, officers performed a no-knock raid to execute a narcotics warrant inside a residence. During his subsequent arrest, arrestee Darden was thrown to the ground, tased, choked, and punched. He was obese and died from a heart attack during the encounter. Throughout Darden's arrest other people in the residence were repeatedly yelling that Darden could not breathe. A unanimous panel of this court held it clearly established that the degree of force an officer can reasonably employ is reduced when an arrestee is not actively resisting. Because *Darden* was issued years before the relevant encounter here, the district court held that it applied to this case; Nissen, according to the district court, was therefore on notice that it was unlawful to use excessive force against a person who was on the ground, not resisting, and possibly unable to breathe.

Op. at 16–17 (cleaned up).

But the many differences from *Darden* are striking. One is sufficient: *Darden never attempted to escape the police.* Here's how the court described the beginning of that raid:

> When the police first arrived at the house, the entry team broke down the front door with a battering ram, yelled that they were police, and ordered everyone to get down. A large man, later identified as Darden, was kneeling on the seat of a couch near the door when the officers first entered, and he immediately raised his hands in the air.

*Darden v. City of Fort Worth*, 880 F.3d 722, 725 (5th Cir. 2018). Darden made no effort to run at any point. That stands in striking contrast to Ambler's prolonged flight with reckless disregard for the lives of others.

The majority pushes back by insisting that Nissen's argument depends on the premise that "Ambler continued fleeing throughout the en-

counter, despite the clear video evidence suggesting otherwise." Op. at 17. Even were that portrayal of facts correct, that misses the point: Ambler's *immediately prior flight* fundamentally changes the analysis, particularly because he was not yet restrained.

That's where *Salazar* comes in. *Salazar* stands for the proposition that lack of restraint after an extended attempt to escape justifies a heightened used of force. *See* 37 F.4th at 284. The majority faults the analogy to *Salazar*, because unlike as in *Salazar*,

> Nissen entered the arrest scene nearly one minute after the chase. On arrival, Nissen witnessed several officers surrounding Ambler's body with one officer pointing a taser to Ambler's neck. Distinguishing matters further, Ambler was gasping as he presumably underwent a medical emergency, all the while repeating "I have congestive heart failure," and "I can't breathe."

Op. at 8. But these distinctions are not as extreme as the majority makes them out to be.[11] And, more importantly, it tiptoes away from the relevant standard here. *Salazar* creates enough ambiguity that the law is not *clearly established*. At the time of the officers' respective arrivals, both subjects remained unrestrained. Sure, officers were hovering over Ambler, but that hardly constitutes restraint, given Ambler's size, proximity to the unsearched car, and demonstrated hostility to arrest.[12]

---

[11] For example, the gap between the arrival of the officers in *Salazar* (eight seconds), 37 F.4th at 280, and Nissen here ("nearly one minute"), is still a matter of seconds.

[12] For what it's worth, the chase here was also substantially longer and more dangerous than that in *Salazar* (in which the chase lasted 5 minutes and topped out at 70 mph). *Id.* So, even if the treatment of the suspects between the cases were meaningfully different, the discrepancy would be justified because officers could reasonably believe that Ambler was considerably more dangerous than Salazar.

No. 23-50696

## III.

For largely similar reasons, the failure-to-intervene claim fails at both prongs of the analysis. Taser deployment easily gets expanded leeway after a high-speed chase. *See Salazar*, 37 F.4th at 284. If the officers were not clearly committing a constitutional violation, then Nissen cannot be faulted for failing to intervene.[13] And Nissen gets even broader leniency because of his late arrival.[14] Neither the majority nor the briefing serves up a case that overcomes the doubt raised by *Salazar* as to the law in these circumstances. Indeed, neither *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013), nor *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012), involved a flight from justice at all.

\* \* \* \* \*

The majority's opinion serves nobody but this plaintiff. Police will be unduly subject to litigation because of circumstances completely beyond their control. Suspects face greater danger because police now have an incentive to use deadly force instead of de-escalating.

Because Officer Nissen acted as would any reasonable officer in this tricky, high-stakes, split-second situation, I respectfully dissent.

---

[13] Though not legally relevant here, it's worth noting that the officers were acquitted of manslaughter, criminally negligent homicide, and assault by a jury. *See* Serena Lin & Tony Plohetski, *Former sheriff's deputies found not guilty of all charges in death of Javier Ambler*, AUSTIN AM.-STATESMAN, Mar. 7, 2024, available at https://tinyurl.com/94aprsxj.

[14] "Clearly established federal law does not prohibit a reasonable officer who arrives late to an ongoing police action in circumstances like this from assuming that proper procedures, such as officer identification, have already been followed." *White v. Pauly*, 580 U.S. 73, 80 (2017). *Cf., e.g., Otkins v. Gilboy*, 2023 WL 6518119 at \*3–4 (5th Cir. Oct. 5, 2023) (per curiam) (unpublished) (affirming QI for late-arriving officers with limited information while vacating as to first responder).